No. 23-3518

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

UNITED STATES OF AMERICA,
*Appellee,*
v.
JASON M. POTTER,
*Appellant*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
HONORABLE ROSEANN A. KETCHMARK
(No.21-00120-01-CR-W-RK)

**ADDENDUM OF APPELLANT**

Christopher S. Swiecicki
SWIECICKI & MUSKETT, LLC
16100 Chesterfield Parkway W, Ste 368
Chesterfield, MO, 63017
Office: (636) 778-0209
Direct: (314) 341-5796
Chris@SwiecickiLaw.com
Attorney for Appellant

# TABLE OF CONTENTS

Judgment in a Criminal Case (Judge Ketchmark) ..................... 1

Report and Recommendation of Magistrate Denying
    Defendant's Motion to Suppress (Magistrate Gaddy) ........... 8

District Court Adoption of
    Report and Recommendation (Judge Sachs)....................... 26

Lee's Summit Police Department Tow Policy .......................... 28

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **JUDGMENT IN A CRIMINAL CASE** |
| | § | |
| v. | § | |
| | § | Case Number: **4:21-00120-01-CR-W-RK** |
| | § | |
| **JASON M. POTTER** | § | USM Number: **51307-509** |
| | § | *Lisa G. Nouri, CJA* |
| | § | Defendant's Attorney |

**THE DEFENDANT:**

☒ was found guilty via jury trial in reference to Counts 1 and 2 of a 2-count Indictment on 02/16/2023 before the Honorable Roseann A. Ketchmark.

The defendant is adjudicated guilty of these offenses:

| Title & Section / Nature of Offense | Offense Ended | Count |
|---|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(A) and 846 - Conspiracy to Distribute and Possess with Intent to Distribute 500 Grams or More of Methamphetamine | 07/15/20 | 1 |
| 21 U.S.C. § 841(a)(1) and (b)(1)(A) - Possession with Intent to Distribute 500 Grams or More of Methamphetamine | 07/15/20 | 2 |

The defendant is sentenced as provided in the following pages of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ of the Indictment ☐ is ☐ are dismissed.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**November 8, 2023**
Date of Imposition of Judgment

/s/ Roseann A. Ketchmark
Signature of Judge

**ROSEANN A. KETCHMARK**
**U.S. DISTRICT COURT JUDGE**
Name and Title of Judge

**November 14, 2023**
Date

DEFENDANT: **JASON M. POTTER**
CASE NUMBER: 4:21-00120-01-CR-W-RK

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

> **360 months on Count 1, and 360 months on Count 2, the terms to run concurrently, for a total of 360 months.**

☒ The court makes the following recommendations to the Bureau of Prisons:

> **The defendant be screened for placement at FCI Greenville, IL for participation in its vocational/technical program(s).**

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ ☐ a.m. ☐ p.m. on

   ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ On
   ☐ as notified by the United States Marshal.
   ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to

at _____, with a certified copy of this judgment.

UNITED STATES MARSHAL

By
DEPUTY UNITED STATES MARSHAL

2

DEFENDANT:          **JASON M. POTTER**
CASE NUMBER:       4:21-00120-01-CR-W-RK

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:  **Five (5) years. This consists of 5 years on both Counts 1 and 2, the terms to run concurrently, for a total of 5 years.**

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.

2. You must not unlawfully possess a controlled substance.

3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

    ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. (*check if applicable*)

4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. (*check if applicable*)

5. ☒ You must cooperate in the collection of DNA as directed by the probation officer. (*check if applicable*)

6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. (*check if applicable*)

7. ☐ You must participate in an approved program for domestic violence. (*check if applicable*)

You must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

3

Addendum 003

DEFENDANT:      **JASON M. POTTER**
CASE NUMBER:     4:21-00120-01-CR-W-RK

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature   _____      Date  _____

4

DEFENDANT:     **JASON M. POTTER**
CASE NUMBER:   4:21-00120-01-CR-W-RK

# SPECIAL CONDITIONS OF SUPERVISION

1.  The defendant shall successfully participate in any outpatient or inpatient substance abuse counseling program which may include urinalysis, sweat patch, or Breathalyzer testing as approved by the Probation Office, and pay any associated costs as directed by the Probation Office.

2.  The defendant shall submit his person and any property, house, residence, office, vehicle, papers, computer, other electronic communication or data storage devices or media and effects to a search, conducted by a U.S. Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

3.  The defendant shall comply with the Western District of Missouri Offender Employment Guideline which may include participation in training, counseling, and/or daily job searching as directed by the probation officer. If not in compliance with the condition of supervision requiring full-time employment at a lawful occupation, the defendant may be required to perform up to 20 hours of community service per week until employed, as approved or directed by the probation officer.

4.  The defendant shall not enter any gambling establishment or engage in any type of gambling, including offshore or internet gambling.

# ACKNOWLEDGMENT OF CONDITIONS

I have read or have read the conditions of supervision set forth in this judgment and I fully understand them.  I have been provided a copy of them.

I understand that upon finding of a violation of probation or supervised release, the Court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

| | |
|---|---|
| _____ | _____ |
| DEFENDANT | DATE |
| | |
| _____ | _____ |
| UNITED STATES PROBATION OFFICER | DATE |

Addendum 005

DEFENDANT: **JASON M. POTTER**
CASE NUMBER: 4:21-00120-01-CR-W-RK

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments page.

|  | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $200.00 | $0 | $0 | $0 | $0 |

☐ The determination of restitution is deferred until _An Amended Judgment in a Criminal Case (AO245C)_ will be entered after such determination.
The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

    If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the schedule of payments page may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☒ the interest requirement is waived    ☐ fine    ☐ restitution

    ☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT:     **JASON M. POTTER**
CASE NUMBER:     4:21-00120-01-CR-W-RK

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**   ☒   **Lump sum payments of $100.00 on each of the counts for a total of $200.00, which shall be due immediately.**

    ☐   not later than                        , or

    ☐   in accordance     ☐   C,     ☐   D,     ☐   E, or     ☐   F below; or

**B**   ☐   Payment to begin immediately (may be combined with     ☐   C,     ☐   D, or     ☐   F below); or

**C**   ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment;
    or

**D**   ☐   Payment in equal 20 *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from
    imprisonment to a term of supervision; or

**E**   ☐   Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release
    from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that
    time; or

**F**   ☒   Special instructions regarding the payment of criminal monetary penalties:

      Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary
penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of
Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

      Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5)
fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution
and court costs.

Case 4:21-cr-00120-RK   Document 258   Filed 11/14/23   Page 7 of 7

Addendum 007

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 21-00120-01-CR-W-HFS |
| | ) | |
| JASON M. POTTER, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending is Defendant's Motion to Suppress filed on June 13, 2022. Doc. 74.[1] On July 15, 2022, the Government filed its opposition to Defendant's motion. Doc. 80. Defendant filed a pro se reply on August 4, 2022, which was "adopted" by defense counsel on August 8, 2022.[2] Docs. 83, 87. For the reasons set forth below, the undersigned recommends Defendant's Motion to Suppress be **DENIED**.

## I. BACKGROUND

On May 20, 2021, the grand jury returned an indictment charging Defendant Jason M. Potter with conspiracy to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846;

---

[1] Defendant previously sought and was granted leave to file his motion to suppress out of time. Docs. 72-73.

[2] On August 4, 2022, Defendant also filed a pro se "Opposition to Plaintiffs [sic] Response with Defendants [sic] Affidavit Attached Hereto" and another letter referencing an affidavit, both of which were adopted by his counsel. Docs. 84-85, 87. Additionally, Defendant filed a pro se "Affidavit in Support of Motion to Suppress with Suggestions." Doc. 95. "A defendant does not have a constitutional right 'to simultaneously proceed pro se *and* with the benefit of counsel.'" *Fiorito v. United States*, 821 F.3d 999, 1003 (8th Cir. 2016) (quoting *United States v. Agofsky*, 20 F.3d 866, 872 (8th Cir. 1994)). While this Court has discretion to permit "hybrid representation," no such request has been sought or granted in this matter. *United States v. Summage*, 575 F.3d 864, 876 (8th Cir. 2009). Nevertheless, the undersigned considered Defendant's pro se filings in the interests of justice and due to the unique circumstances of the instant matter, including counsel's "adoption" of the same. In doing so, the undersigned is not approving, or recommending the approval, of any form of hybrid representation where Defendant is allowed to proceed both pro se and through appointed counsel.

and possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Doc. 1. The charges stem from controlled substances seized by law enforcement after a traffic stop on July 15, 2020. *See id.* Defendant moves to suppress all evidence seized because law enforcement lacked probable cause to search his vehicle. *See* Doc. 74 at 7-14.

On August 17, 2022, the undersigned held an evidentiary hearing on Defendant's motion. Docs. 90, 92. Defendant was present and represented by counsel, Lisa Nouri. The Government was represented by Assistant United States Attorneys Maureen Brackett and Stephanie Bradshaw. At the hearing, Officers Andrew Jones, David Smith, and Casca Hunter testified. In addition, and without objection from Defendant, the Court admitted thirty exhibits. Doc. 93.

## II.     FINDINGS OF FACT

Based on the evidence adduced at the evidentiary hearing, the undersigned submits the following findings of fact:

1.       On July 15, 2020, Officer David Smith and Sergeant Brad Anders with the Lee's Summit, Missouri Police Department ("LSPD") were conducting surveillance at America's Best Value Inn located at 1020 Southeast Blue Parkway, Lee's Summit, Missouri. Tr. at 6-8, 96-97, 99-100, 103.[3] The officers were surveilling the hotel due to complaints of drug activity and stolen vehicles being recovered there. Tr. at 9, 11-12, 73, 102-03, 128.

2.       During surveillance, Officer Smith[4] and Sergeant Anders ran vehicle license plates and observed activities ongoing at the hotel. Tr. at 9-12, 103. At some point, the officers observed

---

[3] "Tr." refers to the Transcript of Hearing on Motions to Suppress Evidence. Doc. 92.

[4] For the past five years, Officer Smith has worked for the LSPD. Tr. at 95. Currently, he works as a police officer assigned to the Crime Reduction Team. *Id.* Prior to joining the LSPD, Officer Smith was a detention officer, a police officer and a detective in Sedalia, Missouri for fourteen years. Tr. at 95-96.

a black 2009 Nissan Maxima with the license plate number ZC3 A0L crookedly parked[5] between two spaces in the hotel's lot. Tr. at 103-04; Gov't Ex. 4.

3.      Officer Smith provided the license plate number to Officers Andrew Jones and Casca Hunter to run through their computer system.[6] Tr. at 12, 105. Officer Jones[7] ran the Maxima's license plate number and advised the vehicle was registered to Defendant Jason Potter who had an outstanding arrest warrant for a parole violation.[8] Tr. at 12-13, 105-06. Officer Jones sent Defendant's driver's license photograph and identifiers, such as his height, weight, and eye color, to the surveilling officers. Tr. at 15-17, 107-08.

4.      Officer Smith then observed Defendant exit the back side of the hotel with another individual, later identified as Codefendant Daniel Dryden, carrying two bags.[9] Tr. at 21, 108-109. Defendant placed the bags in the backseat of the passenger side of his vehicle and returned to the hotel. Tr. at 22, 109. Dryden drove Defendant's vehicle to the front of the hotel and cleaned trash out of the inside. Tr. at 109.

5.      After a few minutes, Defendant exited the hotel carrying a brown bank money bag and sat in the front passenger's seat of the vehicle. Tr. at 110, 113. Officer Smith positively identified Defendant and observed his vehicle leave the hotel's parking lot and travel west. Tr. at 22, 113. Officers Jones and Hunter, who were parked in an unmarked police vehicle approximately

---

[5] Officer Smith found the manner in which the vehicle was parked – in two parking spots – was suspicious and suggested the person arrived quickly and was going to leave quickly. Tr. at 104-05.

[6] Officer Smith and Sergeant Anders were not in a police vehicle, and therefore, did not have access to a computer to run license plates. Tr. at 99, 105.

[7] Prior to his current employment with the St. Louis Police Department, Officer Jones was a LSPD police officer and a member of the Crime Reduction Team unit from January 2016 to March 2021. Tr. at 4-6.

[8] During previous surveillance, Officer Jones observed Defendant's vehicle at the hotel and ran its license plate. Tr. at 14, 71-72. Officer Jones was aware Defendant had an active parole violation warrant prior to his observations on July 15, 2020. Tr. at 13-14, 72.

[9] One bag was a black computer-type bag, and the other was a blue reusable Wal-Mart bag. Tr. at 109, 119; *see* Gov't Exs. 5-7.

3

two or three businesses away from the hotel, observed Defendant's vehicle drive past them on Southeast Blue Parkway.[10]  Tr. at 10, 22-24; Gov't Ex. 1[11] at 1:49:13 – 1:49:15 p.m.; *see* Gov't Ex. 20.

6.     Officer Hunter[12] initiated his vehicle's lights and sirens, pulled behind Defendant's vehicle, and conducted a traffic stop.  Tr. at 134; Gov't Ex. 1 at 1:49:13 – 1:49:45 p.m.; Gov't Ex. 4.[13]  He approached the vehicle on the driver's side, and Officer Jones approached on the passenger's side.  Tr. at 27-28; Gov't Ex. 1 at 1:49:53 – 1:49:59 p.m.

7.     The officers asked both vehicle occupants for their identification.  Tr. at 30-32; Gov't Ex. 1 at 1:50:07 – 1:50:10 p.m.  Defendant shuffled through multiple cards and eventually provided his driver's license to Officer Jones.  Tr. at 29-31; Gov't Ex. 1 at 1:50:10 – 1:50:43 p.m.; Gov't Ex. 3.  Officer Jones asked Defendant to step out of the vehicle and inquired if he possessed any weapons.  Tr. at 31-32; Gov't Ex. 1 at 1:50:50 – 1:51:05 p.m.  Defendant did not respond to the officer's inquiry about weapons, which Officer Jones found concerning.  Tr. at 31-32.

8.     Defendant then asked if he could call "his people."  Tr. at 31-32; Gov't Ex. 1 at 1:51:01 – 1:51:08 p.m.  Officer Jones said, "You're not gonna be makin' phone calls," and removed a cell phone and wallet from Defendant's hands.  Tr. at 32, 72, 84; Gov't Ex. 1 at 1:51:03 – 1:09 p.m.  According to Officer Jones, he removed the items so they could not be used against the officers and so he could gain control of Defendant's hands for detention.  Tr. at 32, 72, 84.

---

[10] According to the officers, Southwest Blue Parkway is an outer road running parallel to U.S. 50 Highway and is "very traveled."  Tr. at 23.

[11] Government's Exhibit 1 is the video recorded by Officer Jones's dashcam.  Tr. at 24-25.  Officer Jones testified the video is a true and accurate representation of the traffic stop and interaction with Defendant on July 15, 2020.  Tr. at 25.

[12] For the past five years, Officer Hunter has worked as an LSPD patrol officer and is currently assigned to the Crime Reduction Team.  Tr. at 132.  Prior to joining law enforcement, Officer Hunter served five years in the United States Marine Corps, and four years in overseas contracting.  Tr. at 133.

[13] Officer Jones identified the voice in Government Exhibit 1 as his own.  Tr. at 28-29.  According to the officers, Officer Hunter's microphone was not synched to the dashcam footage.  Tr. at 28-29, 134-35.

Defendant's cell phone and wallet were placed on top of his vehicle, and Defendant was detained. Tr. at 32-33, 72; Gov't Ex. 1 at 1:51:06 – 1:51:32 p.m. Officer Hunter escorted Defendant to the front of his patrol vehicle, and Officer Jones contacted Dryden. Tr. at 33-34; Gov't Ex. 1 at 1:51:33 – 1:51:57 p.m. Officer Jones asked Dryden if his driver's license was valid, and he advised it was not. Tr. at 34; Gov't Ex. 1 at 1:51:59 – 1:52:16 p.m. According to Officer Jones, law enforcement cannot allow a non-licensed driver to continue operating a motor vehicle. Tr. at 34.

9.      Although Defendant's arrest warrant was showing as "active" in the computer database, Officer Jones contacted dispatch to confirm the warrant remained active. Tr. at 35; Gov't Ex. 1 at 1:52:39 – 1:53:22 p.m. To make this confirmation, dispatchers contact the warrant's originating agency, inquire if it is still active, and determine if the agency will extradite and pick up the individual. Tr. at 35. Simultaneously, Officer Hunter conducted a pat down of Defendant's person for any weapons or contraband. Gov't Ex. 1 at 1:52:24 – 1:53:22 p.m.

10.      Defendant was placed in the back of the police vehicle, and Officer Jones again contacted Dryden. Gov't Ex. 1 at 1:54:12 – 1:55:59 p.m. After a brief conversation, Officer Jones returned to the police vehicle, ran Dryden's information, and confirmed his driver's license was suspended. Tr. at 36-38, 85; Gov't Ex. 1 at 1:56:19 – 1:58:50 p.m.

11.      Because Dryden could not legally drive the vehicle due to a suspended license, Officer Jones asked Defendant if anyone was available who could remove the vehicle from the scene. Tr. at 34, 38-39; Gov't Ex. 1 at 1:58:50 – 1:59:17 p.m. Defendant provided two names of authorized drivers: (1) Glen Bernstein, and (2) Erin, the hotel's night manager.[14] Tr. at 39; Gov't

---

[14] Officer Jones did not know "Erin" personally and did not know what she looked like. Tr. at 74-75, 85-86. Based on prior surveillance, Officer Jones knew a red Explorer was registered to someone named "Erin Melton," but he was unaware if Erin Melton was the same "Erin" who was identified by Defendant. Tr. at 74-75.

Ex. 1 at 1:59:18 – 2:00:13 p.m. Defendant provided a phone number for Mr. Bernstein. Tr. at 47-48; Gov't Ex. 1 at 2:00:13 – 2:00:18 p.m.

12.      At approximately 2:01 p.m., dispatch confirmed Defendant's arrest warrant remained active and the originating agency would extradite. Tr. at 40, 72-73, 115; Gov't Ex. 1 at 2:01:15 – 2:01:32 p.m. Officer Jones contacted Dryden, who was still in the driver's seat of Defendant's vehicle, and released him with a warning. Tr. at 46; Gov't Ex. 1 at 2:01:36 – 2:01:57 p.m. Dryden indicated he would walk away from the scene and exited the vehicle. Tr. at 42-43; Gov't Ex. 1 at 2:02:43 – 2:03:44 p.m. As Defendant had authorized Erin as a potential driver, Officer Jones asked Dryden to return to the hotel and contact her which he agreed to do. Tr. at 42, 47-48.

13.      Defendant, still seated in the backseat of the police vehicle, asked to speak with Dryden. Gov't Ex. 1 at 2:04:37 – 2:04:50 p.m. While the two men conversed, Officer Jones made two attempts to call Glen Bernstein.[15] Tr. at 44-45, 48, 80, 87-88; Gov't Ex. 1 at 2:05:00 – 2:06:13 p.m.; Gov't Ex. 8. The first call was made at 2:05 p.m., and the second call occurred at 2:06 p.m.[16] Tr. at 45-46, 48, 87-88; Gov't Ex. 8. During each call attempt, the phone rang approximately six to eight times before voicemail answered. Tr. at 90-91; *see also* Gov't Ex. 1 at 2:05:00 – 2:05:35, 2:05:38 – 2:06:13 p.m. Mr. Bernstein did not answer either call, and Officer Jones did not leave a voicemail. Tr. at 45-46, 80, 91; Gov't Ex. 1 at 2:05:00 – 2:06:13 p.m.; Gov't Ex. 8.

14.      After a brief conversation between Defendant and Dryden, Officer Hunter informed Officer Jones that Dryden would walk back to the hotel and ask Erin, the night manager, if she would drive Defendant's vehicle away. Tr. at 46-47; Gov't Ex. 1 at 2:06:56 – 2:07:14 p.m. Dryden

---

[15] According to Officer Jones, his phone number was not blocked when he contacted Mr. Bernstein. Tr. at 79-80, 88-89; *see also* Gov't Ex. 8.

[16] The duration clock on the call history began when the voicemail picked up the call. Tr. at 90-92.

asked if he could have Defendant's keys, but Officer Jones declined the request because he was not sure if Dryden would be returning to the scene with Erin. Tr. at 48, 76; Gov't Ex. 1 at 2:07:13 – 2:07:22 p.m. According to Officer Jones, the hotel was approximately a quarter mile away and roughly a five-minute walk. Tr. at 69-70, 114.

15.     Officer Jones inventoried the contents of Defendant's wallet which contained $3,500 in cash. Tr. at 48-49, 81; Gov't Ex. 1 at 2:06:46 – 2:09:45 p.m. Shortly thereafter, Defendant was informed he was under arrest, and read his *Miranda* rights which he stated he understood. Tr. at 49; Gov't Ex. 1 at 2:12:50 – 2:13:15 p.m. Defendant exited the patrol vehicle at the officer's request, and was searched incident to arrest. Tr. at 49-50; Gov't Ex. 1 at 2:15:42 – 2:18:24 p.m. During the search of his person, Defendant repeatedly hunched over allegedly due to a cyst on his testicles. Tr. at 50; Gov't Ex. 1 at 2:17:10 – 2:17:30, 2:18:27 – 2:18:46 p.m.

16.     Defendant asked the officer to make another phone call, and in response, Officer Jones showed Defendant his two previous attempts to contact Mr. Bernstein. Tr. at 51-52; Gov't Ex. 1 at 2:20:47 – 2:21:18 p.m.; Gov't Ex. 8. At 2:23 p.m., Officer Jones called Mr. Bernstein for a third time and, again, received no answer. Tr. at 51, 66, 82-83, 88; Gov't Ex. 9.

17.     Defendant was transported from the scene in a separate patrol vehicle at approximately 2:24 p.m. Tr. at 52; Gov't Ex. 1 at 2:24:53 – 2:24:58 p.m. Because no authorized individual was available to drive Defendant's vehicle, Officers Jones and Hunter discussed whether to tow the vehicle. Tr. at 53-54, 135-36, 140; Gov't Ex. 1 at 2:25:14 – 2:28:45 p.m. The officers contacted their supervisor, Sergeant Anders, who confirmed a tow should be ordered. Tr. at 53-54, 78, 135-36, 140; Gov't Ex. 1 at 2:27:14 – 2:28:01 p.m. Rather than immediately ordering a tow, Officer Jones first filled out a portion of the tow sheet to provide additional time for Erin

7

from the hotel or someone else to arrive to remove Defendant's vehicle.[17]  Tr. at 54-55, 67, 136;

Gov't Ex. 1 at 2:25:33 – 2:25:35, 2:28:48 – 2:34:40 p.m.; Gov't Ex. 30.  Officer Smith and Sergeant

Anders, who were still near the hotel, did not observe anyone in the hotel's parking lot or along

the roadway heading toward the other officers.  Tr. at 120-21.

18.     Officer Jones testified the decision to tow Defendant's vehicle and conduct an

inventory search was pursuant to a LSPD tow policy.  Tr. at 57-58.  Pursuant to the policy, an

officer may order a vehicle be towed from public property when, *inter alia*, the vehicle's operator

"is taken into custody," and relevant here, "[t]he person is unable to arrange for the

vehicle/property's proper and timely removal," or "[n]o passengers are present who can legally

remove the vehicle/property with the driver's consent."[18]  Tr. at 57, 67-68, 141-42; Gov't Ex. 2 at

3.  Officers Jones and Hunter ordered a tow of Defendant's vehicle shortly after 2:30 p.m.  Tr. at

57-58, 67-68, 82, 90, 117; Gov't Ex. 1 at 2:34:22 – 2:34:44 p.m.; Gov't Ex. 30.  According to

Officer Jones, LSPD does not allow arrested individuals to contact private companies to tow their

vehicles.  Tr. at 58-59, 78, 81-82, 90.

19.     There is also an inventory search procedure within the LSPD's tow policy which

requires law enforcement to conduct an inventory search of a vehicle being towed.  Tr. at 76; Gov't

Ex. 2 at 2.  At approximately 2:34 p.m., Officer Hunter searched Defendant's vehicle beginning at

the front driver's side door.  Tr. at 59; Gov't Ex. 1 at 2:34:50 – 2:36:55 p.m.  And approximately

eight minutes later, Officer Hunter began searching the rear passenger's side.  Tr. at 60; Gov't Ex.

1 at 2:41:37 p.m.

---

[17] The officers never saw Dryden again.  Tr. at 55.  Neither Mr. Bernstein nor Erin arrived to retrieve Defendant's vehicle.  Tr. at 55; Gov't Ex. 1 at 2:24:53 – 3:08:09 p.m.

[18] The LSPD's policy does not set forth procedures to be used when the vehicle's owner is the passenger who is taken into custody and the vehicle's operator is legally prohibited from operating the vehicle and voluntarily leaves the scene.  Tr. at 77; *See* Gov't Ex. 2.

20.     During the search, officers identified the two bags Defendant placed in the backseat. Tr. at 62-64, 117-19; Gov't Ex. 1 at 2:43:34 – 2:43:45 p.m.; Gov't Exs. 5-7, 30. A subsequent search of those bags revealed large bags of methamphetamine, small jewelry bags used to package methamphetamine, a small scoop to distribute methamphetamine, digital scales, prescription pills, a cell phone, cash, and marijuana. Tr. at 64, 119, 121-26; Gov't Exs. 10-16, 30.

21.     At 2:45 p.m., Officer Jones contacted the jail at dispatch's request. Tr. at 64-65; Gov't Ex. 1 at 2:45:28 – 2:46:10 p.m. He was advised a satchel containing suspected methamphetamine was recovered from Defendant's waist. Tr. at 65, 119-20; Gov't Ex. 1 at 2:45:37 – 2:46:10 p.m. LSPD's tow policy also permits a tow of a vehicle when "an officer has probable cause to believe the vehicle/property is evidence in a crime." Tr. at 86-87; Gov't Ex. 2 at 3. Regardless of his decision to tow the vehicle due to Defendant's arrest and the unavailability of an authorized driver, Officer Jones testified he would have still ordered a tow once he learned about drugs being found on Defendant's person because the vehicle was potentially evidence in a crime. Tr. at 87, 90; *see* Gov't Ex. 2 at 3.

22.     At approximately 2:58 p.m., nearly twenty-five minutes after the inventory search began and after suspected controlled substances were recovered from Defendant's person at the police station, an unidentified individual arrived at the scene and asked to remove the vehicle. Tr. at 83-84, 89-90, 137-40. The individual did not identify himself as Mr. Bernstein, and officers did not ask for his name. Tr. at 89-90, 138-40. Officer Hunter had previously observed this individual park his motorcycle at a QuikTrip convenience store up the road and watch the officers for several minutes. Tr. at 138-39. Shortly after 3:00 p.m., Defendant's vehicle was towed. Gov't Ex. 1 at 3:03:29 – 3:08:07 p.m.; *See* Gov't Ex. 30.

## III.    DISCUSSION

Defendant moves to suppress all evidence seized from his vehicle on July 15, 2020. *See* Doc. 74. He argues law enforcement violated his constitutional rights when they (1) waited for him to leave private property to arrest him, and (2) searched his vehicle without probable cause. *See id.* The Government does not address the timing of Defendant's arrest. *See* Doc. 80. Relating to Defendant's second argument, the Government contends the vehicle search was valid pursuant the inventory exception to the warrant requirement. *Id.* at 6-9. Alternatively, the Government claims the evidence discovered in his vehicle would have been inevitably discovered. *Id.* at 9-10.

### A.    Validity of Arrest

The motion to suppress filed by defense counsel concedes Defendant's arrest was lawful. *See* 74 at 9 ("Defendant Potter had a valid no bond arrest warrant entitling law enforcement to legally arrest him."). Defendant's pro se filing, however, appears to allege officers "were not armed with legal process, or an active arrest warrant" at the beginning of their encounter. Doc. 83 at 4. The evidence presented at the hearing established Defendant's arrest warrant was valid and active, and Defendant failed to present any evidence to the contrary. Accordingly, the undersigned recommends that any argument concerning the validity of the arrest be denied.

### B.    Discretion for Traffic Stop

Defendant contends law enforcement improperly waited until he left private property to initiate a traffic stop. *See* Doc. 74 at 5, 9-10, 13. "A traffic stop constitutes a seizure under the Fourth Amendment and must be supported by either reasonable suspicion or probable cause." *United States v. Foster*, 15 F.4th 874, 877 (8th Cir. 2021). A traffic stop is supported by reasonable suspicion when, for example, "there are reasonable grounds to believe that person is wanted for past criminal conduct." *United States v. Cortez*, 449 U.S. 411, 417 n.2 (1981). If an occupant of a vehicle has an outstanding arrest warrant, the police may stop the vehicle if they reasonably

suspect the wanted person is inside. *See United States v. Kent*, 531 F.3d 642, 650 (8th Cir. 2008); *see also United States v. Cardenas-Celestino*, 510 F.3d 830, 833 (8th Cir. 2008) (observing that "[w]hen probable cause to arrest exists, police are authorized to stop a vehicle containing the subject.").

Here, surveilling officers observed a Nissan Maxima, registered to Defendant, at America's Best Value Inn. Based on their previous surveillance when the vehicle was at the same location, the officers were aware Defendant had an active arrest warrant. The officers again confirmed the existence of the outstanding arrest warrant for Defendant during their investigation on July 15, 2020. The officers obtained a driver's license photograph of Defendant and other identifiers, such as his height, weight, and eye color. Surveilling officers positively identified Defendant and observed him exit the hotel and place two bags in the backseat of his vehicle. The driver of the vehicle (later identified as Dryden) moved the vehicle to the front of the hotel while Defendant went back inside. Defendant then exited the hotel a second time, and entered his vehicle on the passenger's side.

Defendant's vehicle left the hotel's parking lot and headed west on Southwest Blue Parkway. Officers Jones and Hunter, who were parked approximately a block away, observed the vehicle drive by with Defendant in the passenger seat. Officers Jones and Hunter initiated a traffic stop and executed the pending arrest warrant. Defendant's argument concerning the timing and location of the stop of the vehicle is unavailing. There is no constitutional right to be arrested. *Hoffa v. United States*, 385 U.S. 293, 310 (1966). Further, once law enforcement possesses probable cause to arrest an individual, they are not required to do so at a particular time or a particular location. *See United States v. Johnigan*, 90 F.3d 1332, 1337 (8th Cir. 1996); *see also Hoffa*, 385 U.S. at 310 (recognizing the police are not required to arrest a suspect at the "precise

11

moment" at which they have probable cause).  Accordingly, the undersigned recommends a finding that the officers' decision to stop Defendant's vehicle was proper and reasonable.

## C.     Inventory Search of Defendant's Vehicle

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated..." U.S. Const. amend. IV.  To protect citizens from unwarranted government intrusion, the Fourth Amendment generally requires law enforcement to obtain a judicial search warrant based on probable cause before searching private property. *See, e.g., Shade v. City of Farmington*, 309 F.3d 1054, 1059 (8th Cir. 2002).  The United States Supreme Court has held "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

One recognized exception to the Fourth Amendment warrant requirement is the inventory search exception. *See United States v. Williams*, 39 F.4th 1034, 1043 (8th Cir. 2022); *United States v. Nevatt*, 960 F.3d 1015, 1020 (8th Cir. 2020).  "It is well-settled law that a police officer, after lawfully taking custody of an automobile, may conduct a warrantless inventory search of the property to secure and protect vehicles and their contents within police custody." *United States v. Williams*, 777 F.3d 1013, 1015 (8th Cir. 2015) (citation and internal quotations omitted); *see also United States v. Green*, 929 F.3d 989, 992 (8th Cir. 2019) ("An inventory search is reasonable if it is conducted according to standardized police procedures, because doing so vitiates concerns of an investigatory motive or excessive discretion.") (citation and internal quotations omitted).  "The purpose of an inventory search is to protect the owner's property while it remains in police custody, as well as protect police against claims or disputes over lost or stolen property and from potential

dangers." *Nevatt*, 960 F.3d at 1020 (citation omitted). Law enforcement officers may not, however, use an inventory search as a "ruse for general rummaging in order to discover incriminating evidence." *Id.* "The central question in evaluating the propriety of an inventory search is whether, in the totality of the circumstances, the search was reasonable." *United States v. Kennedy*, 427 F.3d 1136, 1143 (8th Cir. 2005).

The Eighth Circuit has observed the inventory search exception often involves distinct police actions, including the decision to impound or tow a vehicle and the decision to search the contents of the vehicle. *See United States v. Arrocha*, 713 F.3d 1159, 1162 (8th Cir. 2013). Regarding impoundment, the police may take protective custody of a vehicle when they have arrested its occupants, even if it is lawfully parked and poses no public safety hazard. *United States v. Petty*, 367 F.3d 1009, 1012 (8th Cir. 2004). "[P]olice may exercise discretion to impound a vehicle, 'so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" *Id.* (quoting *Colorado v. Bertine*, 479 U.S. 367, 375, (1987)).

Defendant contends the officers were not justified in their initial decision to impound and tow the vehicle pursuant to the LSPD tow policy. The officers testified their tow decision was pursuant to Section III(B)(1)(f) of the tow policy, which authorizes officers to tow a vehicle on public property when (1) "the **operator** of the vehicle/property is taken into custody," and (2) "[t]he person is unable to arrange for the vehicle/property's proper and timely removal," or "[n]o passengers are present who can legally remove the vehicle/property with the driver's consent." Gov't Ex. 2 at 3 (emphasis added).

Although the officers relied on Section III(B)(1)(f) of the LSPD tow policy, the evidence adduced at the hearing suggests this section does not precisely fit the unique facts of this case. Here, the "operator" of the car (Dryden) was not taken into custody but was allowed to leave the

scene as he was legally prohibited from driving the car with a suspended license. Further, it was the owner and passenger (Defendant) who was taken into custody and there were no other individuals present who could drive the vehicle.[19]

The Eighth Circuit has observed that tow policies are unique in that they "cannot feasibly give 'clear cut guidance in every potential impoundment situation.'" *Green*, 929 F.3d at 992 (quoting *Petty*, 367 F.3d at 1012). Such is the case here. The Eighth Circuit has also recognized that "inventory searches need not be conducted in a totally mechanical, all or nothing fashion." *Nevatt*, 960 F.3d at 1020 (citation omitted). "Even when law enforcement fails to conduct a search according to standardized procedures, this does not mandate the suppression of the evidence discovered as a result of the search." *United States v. Smith*, 715 F.3d 1110, 1117 (8th Cir. 2013) (quoting *United States v. Rowland*, 341 F.3d 774, 780 (8th Cir. 2003)). The "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020) (citation omitted). Consequently, an inventory search is considered reasonable even when police do not adhere to standardized procedures if the search is not a pretext for an investigatory search. *Nevatt*, 960 F.3d at 1020; *United States v. Morris*, 915 F.3d 552, 557 (8th Cir. 2019) (quoting *United States v. Taylor*, 636 F.3d 461, 465 (8th Cir. 2011)). To show pretext, there must be something else "to suggest the police raised the inventory-search banner in an after-the-fact attempt to justify a simple investigatory search for incriminating evidence." *Nevatt*, 960 F.3d at 1020 (citation omitted). Thus, when officers are not acting in strict accordance with a standard

---

[19] As written, it makes little sense to restrict Section III(B)(1)(f) to only an "operator" and not include the owner of the vehicle, especially in light of the unique aspects of this case where the operator cannot lawfully drive the car and is allowed to leave the scene while the owner/passenger is arrested and taken into custody and no one else is present to drive the car. The Court also questions whether the use of the term "operator" as opposed to "owner/operator" is an error, as the term "owner/operator" is used in numerous other provisions of the tow policy. *See* Gov't Ex. 2. In any event, a court cannot rewrite a standardized tow policy to account for every possible scenario.

procedure or policy, the Court must determine if law enforcement's conduct was nonetheless reasonable and not a pretext for an investigatory search. *See Morris*, 915 F.3d at 557.

Here, Officers Jones and Hunter knew Defendant had an outstanding arrest warrant and was a passenger in a vehicle they observed. The officers stopped Defendant's vehicle at 1:49 p.m., and shortly thereafter, Defendant was detained. Officers Jones and Hunter then determined Dryden, who was operating Defendant's vehicle, did not have a valid driver's license. At 1:59 p.m., Officer Jones asked Defendant who to contact to remove the vehicle. Defendant identified Glen Bernstein and Erin, the hotel's night manager.

Officer Jones unsuccessfully attempted to contact Mr. Bernstein by telephone on three separate occasions. Additionally, Officer Jones and Defendant asked Dryden to return to the hotel to ask Erin to remove the vehicle. After waiting approximately thirty minutes from the beginning of the traffic stop, Officers Jones and Hunter contacted their supervisor, Sergeant Anders, who confirmed a tow should be ordered. Rather than immediately calling a tow truck, Officer Jones began filling out the tow sheet to provide additional time for someone to arrive to remove Defendant's vehicle. Mr. Bernstein, Erin, nor Dryden ever arrived back at the scene, and a tow was ordered shortly after 2:30 p.m.

At 2:34 p.m., forty-five minutes after the traffic stop was initiated, Officer Hunter began an inventory search. Tellingly, Officer Hunter's search began in the front seat of the driver's side. Approximately eight minutes later, he searched the rear passenger's side and discovered Defendant's bags. Although the undersigned is mindful of Defendant's arguments that someone could have arrived, or, alternatively, officers could have sought a search warrant, the officers' actions do not establish any pretextual basis for the tow decision and the inventory search, nor has it been established that officers towed Defendant's vehicle on suspicion of criminal activity at that time. Instead, officers made efforts to accommodate Defendant's request for alternative drivers

15

and waited approximately forty-five minutes for an authorized driver to arrive to remove Defendant's vehicle from the scene. No such person ever arrived prior to the start of the inventory search. After consulting with a supervisor, the officers decided to impound Defendant's vehicle pursuant to the LSPD tow policy, even though said policy did not squarely address the unique factual circumstances of this case.

On this record, there is no evidence the police impounded Defendant's vehicle or conducted an inventory search[20] as a pretext to conduct an investigatory search. Further, the officers' decision to tow Defendant's vehicle was not done in bad faith or for the sole purpose of conducting a criminal investigation. Based on the totality of the circumstances, the officers' actions were reasonable. Accordingly, the undersigned recommends a finding that the evidence seized from Defendant's vehicle should not be suppressed pursuant to the inventory search exception.

## D.     Inevitable Discovery

Alternatively, the Government maintains Defendant's motion should be denied because the contraband in Defendant's vehicle would have been inevitably discovered. Doc. 80 at 9-10. The Eighth Circuit utilizes two approaches to evaluate the inevitable discovery doctrine. *See United States v. Baez*, 983 F.3d 1029, 1038 (8th Cir. 2020). Under the first approach, evidence is admissible if the Government establishes the "evidence would have been acquired lawfully but for the constitutional violation." *Id.* (citations omitted). Under the second approach, the inevitable discovery doctrine applies if the Government demonstrates by a preponderance of the evidence that (1) "there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct," and (2) law enforcement was "actively

---

[20] The LSPD tow policy also authorizes inventory searches. Tr. at 76; Gov't Ex. 2 at 2. Defendant's briefing does not challenge the manner or scope of the inventory search in this matter. *See* Docs. 74, 83-85, 87.

Addendum 023

pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Connor*, 127 F.3d 663, 667 (8th Cir. 1997) (citation omitted); *see also Baez*, 983 F.3d at 1039.

In *Baez*, the Eighth Circuit recognized it has been inconsistent as to which standard should apply when evaluating the inevitable discovery doctrine. *Baez*, 983 F.3d at 1039. Nonetheless, the Eighth Circuit utilized both standards when finding the evidence should not be suppressed. *Id.* at 1036-40. Regardless of which approach is utilized, the undersigned recommends a finding that the contraband from Defendant's vehicle need not be suppressed pursuant to the inevitable discovery doctrine.

At 2:24 p.m., Defendant was transported to the police station, and ten minutes later, Officer Hunter began inventorying the vehicle. At approximately 2:45 p.m., Officer Jones was informed a satchel containing suspected methamphetamine was recovered from Defendant's waist during the booking process at the police station. This was also consistent with Officer Jones's initial search of Defendant at the scene of the traffic stop when he kept bending over to avoid a search of that area of his body due to purported medical reasons. Officer Jones testified that regardless of the decision to tow the vehicle due to Defendant's arrest, and the unavailability of an alternate driver, he would have ordered a tow of Defendant's vehicle after the discovery of drugs on the Defendant's person because the vehicle was potentially evidence in a crime. The unidentified individual arrived on the scene fifteen minutes after officers were informed about the methamphetamine on Defendant's person. As such, his subsequent arrival has no material bearing on inevitable discovery because the tow would have presumably been ordered prior to his arrival.

Consequently, even if officers did not order a tow until they were informed of the methamphetamine found on Defendant's person at the police station, a subsequent tow and inventory search would have been conducted pursuant to the tow policy and would have inevitably

17

led to the discovery of the contraband in Defendant's backseat. The Government has met its burden, under either approach, of demonstrating the evidence would have been inevitably discovered. Accordingly, the undersigned recommends a finding that the evidence seized need not be suppressed pursuant to the inevitable discovery doctrine.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's Motion to Suppress (Doc. 74). It is further

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying any additional or alternative relief sought in Defendant's pro se filings (Docs. 83-85, 95).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation except on the grounds of plain error or manifest injustice.

DATE: October 14, 2022

_/s/ W. Brian Gaddy_
W. BRIAN GADDY
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-00120-CR-W-HFS |
| | ) | |
| JASON M. POTTER | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

Presently pending is a motion to suppress (Doc. 74), and a Report and Recommendation (Doc. 99), as well as various motions by defendant in his pro se status. (Docs. 143 and 144).

Defendant's authority to represent himself should not be given retroactive effect—authorizing him to reopen briefing on the motion to suppress. Defendant's counsel did not call him as a witness at the suppression hearing (which conforms with usual practice), and he currently suggests no pertinent testimony he could supply. In the unlikely event there is a sound complaint about counsel's conduct it would be premature to deal with it until a 2255 motion is timely. In any event, an overly literal

Addendum 026

application of the tow policy should not defeat the common-sense use applied here. Defendant's contention about retention of the car keys makes no practical difference when a timely potential driver has not been identified.

After review of the record and briefing, the Report and Recommendation (Doc. 99) is ADOPTED, and the motion to suppress (Doc. 74) is DENIED, as well as the pro se motions requesting overruling of the R&R (Doc. 143), and for leave to file objections and supplemental objections to the R&R (Doc. 144). [1]

/s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

Dated: January 20, 2023
Kansas City, Missouri

---

[1] Since the filing of the R&R, defense counsel has filed objections (Doc. 110), and defendant has also filed objections in his pro se status, specifically arguing violation of a right to be heard at the suppression hearing. (Doc. 120). As noted above, the undersigned has reviewed the record and briefings associated with this matter, and despite defendant's repeated protests, he offers no persuasive authority to revisit issues that have been considered in full.

## LEE'S SUMMIT POLICE DEPARTMENT
## GENERAL ORDER 200.21A

| SUBJECT: Towing, Vehicle/Property | Issue Date: 11-22-13 | Effective Date: 11-22-13 |
|---|---|---|
| Rescinds: G.O. 200.21 issued on 01-09-09 | | |
| Reference: CALEA 61.4.3; 304.001, 304.154, 304.155, 304.156, and 304.157 RSMo; City Ordinance 29-60 | | |
| By Order Of: Joe Piccinini, Chief Of Police | | |

## I.    POLICY

**Vehicles will be towed in compliance with established laws, ordinances, and contracts.**

## II.    DEFINITIONS

A. **Abandoned Property** – any unattended motor vehicle, trailer, all-terrain vehicle, outboard motor, or vessel removed or subject to removal from public or private property as provided in City Ordinance 29.60 and Section 304.155 and 304.157 RSMo, whether or not operational.
B. **Citizen Requested Tow** – a request by a citizen for the service of a specifically named tow company.
C. **Non-Preference Tow** – a request by a citizen for the service of a non-specific tow company; where in, a tow service under contractual agreement with the City is utilized.
D. **Police Ordered Tow** – a request by an officer/employee for the service of a tow company that is under contractual agreement with the City.

## III.    PROCEDURES

A. Officer Responsibilities for Abandoned Vehicles/Property (61.4.3a)
   1. Before towing of any vehicle/property, a reasonable attempt to locate and notify the owner will be made in an effort to get the vehicle/property removed.
      a. If the owner cannot be located, a tow sticker will be placed on the vehicle to afford the owner with an opportunity to move the vehicle/property within the designated time frame.
   2. After 10 (ten) hours on any interstate, freeway, or state highway; or forty-eight (48) hours on a city street has elapsed without the vehicle/property being moved, an officer will remove the vehicle/property to a secure impound lot using a city tow service and complete a Crime Inquiry and Inspection Report/Authorization to Tow Form – DOR 4569 including an inventory of the contents. (61.4.3c)
   3. An officer will request a tow service (specifying Police Ordered, Citizen Requested, or Non-Preference Tow) through the Communications Unit. An officer should provide the following information to a Communications Specialist (CMS):
      a. The vehicle license number and/or Vehicle Identification Number (VIN);
         • The officer will obtain and place the last registered owner/lien holder information, if known, on the Tow Form – DOR 4569.
      b. The location where the vehicle/property is to be towed;

**EXHIBIT A**

    c. The type of vehicle/property to be towed; (e.g., motorcycle, passenger car, truck, trailer, etc.)

    d. Any special circumstances that the tow service may need to know; (e.g., winch, dollies, vehicle is under water, overturned, etc.) and,

    e. If protected storage is required.

4. An officer(s) will:

    a. Examine the vehicle/property for damage and place a notation on the <u>Tow Form – DOR 4569</u> of anything remarkable.

    b. Inventory vehicle/property that is towed and/or impounded to include:

- An inventory of the personal property within the vehicle, including the glove compartment and trunk, provided that the inventory can be conducted without damage to the vehicle or its contents.
- Weapons, contraband, currency (exceeding one hundred dollars), and items having potential evidentiary value will be removed from the vehicle/property and placed in Property/Evidence for the purpose of safekeeping with a Property/Evidence Report being completed.
- The description and/or identification of valuable items (including serial numbers) will be listed on the Tow Form.
- Articles of personal luggage or any container that can be opened without being damaged will be opened for the purpose of inventorying the contents.
- Vehicle keys should remain with the vehicle, if at all possible, for security reasons.
  - i. If the vehicle is to be held for evidence, processing, and/or possible seizure/forfeiture, the keys may be retained and delivered as property/evidence.

    c. Process recovered stolen vehicles at the scene of recovery, if practical, or tow to the Police Department.

- The investigating officer will notify the owner of the recovery of the vehicle and provide information about the release.
- If unable to release to the owner at the scene, complete <u>Tow Form – DOR 4569</u> and forward to the Patrol Unit Secretary with the following: (61.4.3c)
  - i. The name and address of the tow service; and,
  - ii. Personal signature of the tow operator.

    d. Provide the tow service with the:

- Incident/Computer Aided Dispatch (CAD) number;
- Vehicle/Property owner's name, address, and phone number, if available; and.
- Signature and date/time of tow on the tow ticket provided by the tow company with a copy being forwarded to the Patrol Unit Secretary.

    e. Within 2 (two) hours, if practical, of any vehicle/property removal <u>Tow Form – DOR-4569</u> will be submitted to on-duty CMS. (61.4.3c)

    f. Determine whether it is appropriate to issue a Uniformed Traffic Ticket (UTT) to the registered owner of a vehicle/property as authorized by City Ordinance 29-60.

**EXHIBIT A**

**POTT_39068**

B. Police Ordered Public Property Tows
   1. An officer may tow a vehicle/property within the City Limits of Lee's Summit under the following situations when: (61.4.3b)
      a. abandoned vehicle/property is on the right of way. (Refer to Section A, 2) (61.4.3a,b)
      b. abandoned vehicle/property is left unattended and in such a manner that it obstructs the normal movement of traffic or constitutes a hazard to public safety and there is no reasonable indication that the person in control of the vehicle/property is arranging for its immediate control or removal. (61.4.3a,b)
      c. in the interest of public safety, the vehicle/property removal is necessary. (e.g., fire, flood, snow removal, street work, or other emergency reason)
      d. being driven upon the public streets in such condition that it constitutes a hazard to its occupants, pedestrians, or vehicular traffic. (61.4.3b)
      e. the person in charge of the vehicle/property is physically or mentally incapacitated to such an extent as to be unable to provide for the vehicle/property custody and removal. (e.g., traffic crashes, protective custody detentions) (61.4.3b)
      f. the operator of the vehicle/property is taken into custody and at least one of the following conditions exist: (61.4.3b)
         • The person is unable to arrange for the vehicle/property's proper and timely removal;
         • No passengers are present who can legally remove the vehicle/property with the driver's consent;
         • The vehicle/property is illegally parked; or,
         • The vehicle/property presents a traffic hazard if left in its position. or,
         • The vehicle/property is stopped on private property that does not belong to the operator/owner
      g. an officer has probable cause to believe the vehicle/property is evidence in a crime.
      h. a lawful demand order exists from another law enforcement or government agency.
      i. recovering any vehicle/property that has been reported as stolen or upon request of the owner if taken without their consent.

C. Vehicle Crash Tows
   1. A vehicle involved in a crash may be legally parked by the owner/operator at the crash location in accordance with any restrictions imposed by City Ordinance or by Private Property Ownership.
   2. Vehicle owners/operators may request a specific tow company of their preference.
      a. However, the street must be cleared of the obstruction within 30 minutes, if appropriate.
      b. If the citizen requested tow is unable to respond in that time, an officer(s) will request a Police Ordered Tow.
      c. If vehicle/property is in a crash where the driver is injured, or is unable or unwilling to request a specific tow service, an officer(s) may request a

**EXHIBIT A**

**POTT_39069**

Addendum 030

Police Ordered Tow to have the vehicle/property towed to an impound lot. (61.4.3b)

3. An officer(s) will remain to protect the area from other traffic until all debris is cleared from the roadway.
   a. The clearing of debris is the responsibility of the tow driver.

D. Police Ordered Private Property Tows
   1. Police towing of vehicle/property without consent or warrant from private property is authorized under the following conditions: (304.157 RSMo)
      a. When the owner/operator is taken into custody and the vehicle/property would be left unattended on private property of another without consent and there is no person(s) present who can legally remove the vehicle/property with the operator's/owner's consent; (61.4.3b)
      b. The abandoned vehicle/property is left unattended forty-eight (48) hours; (61.4.3a,b) or,
      c. In the judgment of an officer, the abandoned vehicle/property constitutes a safety hazard or unreasonably interferes with the use of the real property by the person in possession. (61.4.3a,b)

E. Authorized Tow Waiver
   1. When the vehicle is legally parked and the owner/operator does not wish to have the vehicle towed, an officer can have the person sign an <u>Authorized Tow Waiver Form</u> allowing the vehicle/property to remain.
   2. If the vehicle/property is on private property, the property owner must be in agreement to allow the vehicle/property to remain.
      a. The owner/operator will be required to sign an <u>Authorized Tow Waiver Form</u>.

F. Police Holds
   1. An officer may place a "hold" on a towed vehicle/property in the following situations:
      a. The vehicle/property is needed as evidence or to secure evidence from the vehicle where a search warrant is being obtained.
      b. The vehicle/property has been used to transport any controlled substance with the intent to compound, sell, distribute, deliver, dispense, export or import such controlled substance.
   2. When a "hold" is placed on a towed vehicle/property, the officer ordering the hold will mark the "POLICE HOLD DO NOT RELEASE" box on the <u>Tow Form – DOR 4569</u>.
      a. The officer will warn the tow driver to exercise caution to prevent destroying or contaminating evidence if applicable.
   3. A "hold" may only be released by a supervisor/designee, or an outside agency representative that requested the hold.
      a. If an outside agency requests a "hold", CMS will obtain a written request.
      b. CMS will forward the written request to the Patrol Unit Secretary to be filed with the original Tow Report. (61.4.3c)

**EXHIBIT A**

**POTT_39070**

Addendum 031

    4. If a vehicle/property is stored on City property, the person authorizing the release will notify a Property/Evidence custodian who will release the vehicle/property to the registered owner or other designated person.
      a. If stored at a contract tow company impound lot, the tow service will be notified of the authorization for release.

G. CMS Responsibilities
    1. CMS will conduct a computer check of the vehicle license and/or Vehicle Identification Number (VIN) and provide an officer(s) with all registered owner information, liens, and any other pertinent information.
      a. If the vehicle/property is reported as stolen, proper notification will be made to the reporting agency.
      b. If the vehicle/property is not reported as stolen an entry will be made into the MULES Impounded Vehicle File on abandoned vehicle/property.
    2. Notify the proper tow service when requested by an officer, and document the type of tow that was requested (e.g., citizen requested, police ordered, or non-preference tow).
    3. For vehicles/property that are towed without Law Enforcement Authorization, CMS will record the date on which the towing company filed the <u>Abandoned Property Report – DOR 4669</u>, and will promptly make an inquiry into the National Crime Information Center (NCIC) and any statewide Missouri Law Enforcement computer system to determine if the abandoned vehicle/property has been reported stolen.
      a. CMS will enter the information pertaining to the towed vehicle/property into computer system and an officer will sign and provide a copy of the abandoned property report to the tow service.
      b. CMS will search the Department of Revenue (DOR) records and provide the tow service with the latest owner and lien-hold information.

H. Private Property Tow without Law Enforcement Authorization (61.4.3b)
    1. Abandoned vehicles/property on private property will be the responsibility of the property owner, lessee in lawful possession of the real property, or the property or security manager when: (61.4.3a)
      a. The above listed persons are present;
      b. The property or security manager is a full-time employee of the business entity; and under the conditions as outlined in Section 4, Subsection 1, 2, and 3 of <u>304.157 RSMo</u>.
    2. If the owner of the towed vehicle/property cannot be located, a tow service may take action pursuant to guidelines in <u>304.155</u>, <u>304.156</u>, and <u>304.157 RSMo</u> for disposal.
      a. The towing company will deliver a copy of the <u>Abandoned Property Report – DOR 4669</u> to the local law enforcement agency where the property is located within 2 (two) hours. (61.4.3c)
        • State Statute may allow a copy of the form to be delivered within 24 (twenty-four) hours of the tow under certain conditions. (Refer <u>304.157 RSMo</u>)

**EXHIBIT A**

I. Record of Towed Vehicles/Notification of Owner
   1. Tow Form – DOR 4569 is a multi-page report that will be completed by an officer for a Police Ordered Tow. (61.4.3c)
      a. The original (top copy) will be retained by an officer and submitted to the Patrol Unit Secretary with the remaining copies to the tow driver.
   2. The tow company will provide a tow ticket to an officer for a Police Ordered Tow and a Non-Preference Tow to be forwarded to the Patrol Unit.
      a. The listed services and charges should be reviewed by an officer before signing the ticket.
      b. If in disagreement with the noted services and/or charges, an officer should refuse to sign the ticket and provide notification to an on-duty supervisor.
   3. Police tow records on vehicles/property removed, towed, or stored at the direction of an officer/employee will be maintained in the Patrol Unit. (61.4.3c)
      a. Tow Form– DOR 4569 must be submitted to the Director of Revenue's Motor Vehicle Bureau within 10 (ten) working days of authorization of the tow on any unclaimed property.
      b. The Patrol Unit will receive notification from the City contracted tow service of all police ordered tows still in their storage lot.
         • The list will be compared to Tow Form – DOR 4569.
      c. After 3 (three) working days (City Ordinance 29-60(F)), if abandoned vehicle/property has not been released, the Patrol Unit Secretary will send a written notice to the registered owner and any lien holder of the abandoned vehicle/property.
         • The notice must include the fact that the vehicle/property was towed, the grounds for removal, and the place where the vehicle/property is being held.
      d. After 10 (ten) working days of any unclaimed abandoned vehicle/property the Patrol Unit Secretary will forward the tow report (DOR-4569) to the Department of Revenue.

J. Contract Tow Company Service and Performance
   1. The Tow Company will:
      a. be available for response twenty-four (24) hours a day 7 (seven) days per week, 365 days per year; (304.154 RSMo)
      b. maintain a response time of thirty (30) minutes after receiving a call from CMS, provided the location is within the City limits;
         • If the City Tow Service fails to respond within the time period set-forth, CMS may contact the on-duty shift supervisor to obtain permission to request another tow service.
      c. cooperate with the Department and readily accept and follow instructions by officers at the scene;
      d. tow vehicles/property to the approved tow lot within the City limits or other destinations as ordered by officers of the Department.
      e. be responsible for clean up and removal of all debris from the roadway;
      f. furnish all reports required by the Department, Missouri Statutes, and the City;

**EXHIBIT A**

**POTT 39072**

    g.  have all equipment necessary for the removal of the vehicles/property when they arrive at the location of the call;

    h.  provide a copy of the tow ticket to the officer for a police ordered or non-preference tow.

2.  Police Officers will document on an intra-departmental form any problems regarding the City contracted tow service, and forward through the Chain of Command to the appropriate Division Commander/designee.

**EXHIBIT A**

**POTT 39073**

Addendum 034