**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

———————————————

No. 23-3518

———————————————

**UNITED STATES OF AMERICA,**

Appellee,

v.

**JASON M. POTTER,**

Appellant.

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION
HONORABLE ROSEANN A. KETCHMARK, DISTRICT JUDGE

———————————————

**BRIEF FOR THE UNITED STATES**

———————————————

TERESA A. MOORE
  United States Attorney

JUSTIN G. DAVIDS
  Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, 5th Floor
Kansas City, Missouri  64106
Telephone:  (816) 426-3122

*Attorneys for Appellee*

## SUMMARY OF THE CASE

Jason M. Potter and Daniel H. Dryden were indicted for conspiracy to distribute 500 grams or more of methamphetamine and for possessing 500 grams or more of methamphetamine with the intent to distribute. Potter moved to suppress evidence obtained during law enforcement's inventory search of his vehicle. The district court denied his motion. Subsequently, a jury convicted Potter of both counts.

On appeal, Potter reasserts that the evidence should have been suppressed because officers could have arrested him either before he entered his vehicle or before he left the motel's private parking lot. Either way he believes would have avoided the inventory search. But police are not required to arrest a person as soon as there is probable cause to do so. Also, the inventory search was reasonable and there was no evidence it was pretextual. Finally, Potter fails to challenge the district court's alternate conclusion that the inevitable discovery doctrine applied.

Second, for the first time on appeal, Potter alleges the district court vindictively sentenced him. There is, of course, no evidence of this. And, anyway, vindictive sentencing does not apply to an initial sentence.

The United States believes oral argument is unnecessary and the issues may be decided on the briefs. *See* Fed. R. App. P. 34(a)(2)(A) & (C).

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE.......................................................................... i

TABLE OF CONTENTS............................................................................. ii

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF THE ISSUES ....................................................................1

STATEMENT OF THE CASE ......................................................................2

    A.    Statement of the Facts ................................................2

    B.    Procedural History ....................................................9

SUMMARY OF THE ARGUMENTS...........................................................12

ARGUMENTS

I.    The district court did not erroneously interpret the applicable law in denying the motion to suppress, where it concluded that Potter did not have a constitutional right to be arrested prior to leaving the motel parking lot and that the inventory search was reasonable ........................................................................13

    A.    Standard of Review ..................................................13

    B.    Discussion ...............................................................14

II.    The district court did not plainly err by vindictively sentencing Potter when it imposed a within-guidelines sentence .........................21

    A.    Standard of Review ..................................................21

    B.    Discussion ...............................................................22

CONCLUSION...........................................................................................24

CERTIFICATE OF COMPLIANCE.................................................................25

CERTIFICATE OF SERVICE ....................................................................26

ADDENDUM

    Government Suppression Exhibit 2....................................................A1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Greer v. United States*, 593 U.S. 503 (2021)...............................................22

*Heien v. North Carolina*, 574 U.S. 54 (2014) ..............................................18

*Hoffa v. United States*, 385 U.S. 293 (1966) ................................................14

*LeMay v. Mays*, 18 F.4th 283 (8th Cir. 2021) ..............................................16

*Molina-Martinez v. United States*, 578 U.S. 189 (2016)..............................21

*Texas v. McCullough*, 475 U.S. 134 (1986) .................................................22

*United States v. Cardenas-Celestino*, 510 F.3d 830 (8th Cir. 2008).............15

*United States v. Chaplain*, 864 F.3d 853 (8th Cir. 2017)..............................19

*United States v. Flores*, 362 F.3d 1030 (8th Cir. 2004) ...............................19

*United States v. Fry*, 792 F.3d 884 (8th Cir. 2015) ......................................23

*United States v. Goodhouse*, 81 F.4th 786 (8th Cir. 2023) ......................1, 22

*United States v. Johnigan*, 90 F.3d 1332 (8th Cir. 1996).............................14

*United States v. Keck*, 2 F.4th 1085 (8th Cir. 2021)......................................20

*United States v. Kent*, 531 F.3d 642 (8th Cir. 2008) .....................................15

*United States v. Lachowski*, 405 F.3d 696 (8th Cir. 2005).......................1, 22

*United States v. Linnell*, 93 F.4th 1102 (8th Cir. 2024) ...............................14

*United States v. Lowry*, 935 F.3d 638 (8th Cir. 2019)...................................16

*United States v. Martin*, 982 F.2d 1236 (8th Cir. 1993)................................15

*United States v. Morris*, 995 F.3d 665 (8th Cir. 2021)...................... 1, 16, 17

*United States v. Nevatt*, 960 F.3d 1015 (8th Cir. 2020) ...............................15

*United States v. Nielsen*, 74 F.4th 572 (8th Cir. 2023)..................................17

*United States v. Pierre*, 870 F.3d 845 (8th Cir. 2017)...................................23

*United States v. Shigemura*, 682 F.2d 699 (8th Cir. 1982) .......................1, 14

*United States v. Simmons*, 70 F.4th 1086 (8th Cir. 2023) ............................21

*United States v. Smith*, 21 F.4th 510 (8th Cir. 2021)....................................19

*United States v. Williams*, 39 F.4th 1034 (8th Cir. 2022) .........................1, 15

*United States v. Williams*, 976 F.3d 781 (8th Cir. 2020).................... 1, 21, 22

*Waring v. Delo*, 7 F.3d 753 (8th Cir 1993).....................................................22

*Williams v. United States*, 142 S. Ct. 1439 (2022) ........................................21

*Zamarripa v. Busalaki*, 230 F.3d 1365 (8th Cir. 2000) ................................15

## **Statutes**

18 U.S.C. § 3553(a) ............................................................................. 11, 22

## **Rules**

Fed. R. App. P. 34(a)(2)(A) ........................................................................ i

# STATEMENT OF THE ISSUES

## I.

Whether the district court erroneously interpreted the applicable law in denying the motion to suppress, where it concluded that Potter did not have a constitutional right to be arrested prior to leaving the motel parking lot and that the inventory search was reasonable.

### Cases

*United States v. Shigemura*, 682 F.2d 699 (8th Cir. 1982)

*United States v. Williams*, 39 F.4th 1034 (8th Cir. 2022)

*United States v. Morris*, 995 F.3d 665 (8th Cir. 2021)

## II.

Whether the district court plainly erred by vindictively sentencing Potter where it imposed a within-guideline sentence.

### Cases

*United States v. Williams*, 976 F.3d 781 (8th Cir. 2020)

*United States v. Lachowski*, 405 F.3d 696 (8th Cir. 2005)

*United States v. Goodhouse*, 81 F.4th 786 (8th Cir. 2023)

# STATEMENT OF THE CASE

## *A.* *Statement of the Facts*

Lee's Summit, Missouri Police Department officers were conducting surveillance at a motel due to complaints about drug activity and stolen vehicles. (R. Doc. 99, at 2.)[1] They were trying to gather information about what activity was happening at the motel, and also trying to identify any stolen vehicles. (Sup. Tr., at 9.) Officers Andrew Jones and Casca Hunter were in marked uniforms and set up approximately two or three businesses down from the motel. (Sup. Tr., at 6-7, 10.) Officer David Smith and Sergeant Brad Anders were in plain clothes and an unmarked car, sitting in the motel parking lot. (Sup. Tr., at 6-7, 8, 10; R. Doc. 99, at 2.)

The reason that Officers Jones and Hunter were situated down from the motel, and that Officer Smith and Sergeant Anders were in plain clothes, was that having an obvious police vehicle in sight of the motel parking lot would have alerted people to law enforcement presence, potentially disrupting their investigation. (Sup. Tr., at 10.) Because Officer Smith and Sergeant Anders were not in a police vehicle with a computer, they would contact

---

[1] "R. Doc." refers to the district court's ECF docket in Case No. 4:21-cr-00120 (W.D. Mo.) The uncontested facts are generally taken from the magistrate's report and recommendation denying Potter's suppression motion. (R. Doc. 99.) The government supplements those facts, as necessary, from the transcript of the suppression hearing. (Sup. Tr. (R. Doc. 92).)

Officers Jones and Hunter to check license plates in the parking lot. (Sup. Tr., at 11-13.)

Officer Smith and Sergeant Anders saw a crookedly parked black Nissan Maxima, so they requested its plates run. (R. Doc. 99, at 3.) The vehicle came back registered to Jason Potter, who had an active "no bond" arrest warrant for a Missouri parole violation. (R. Doc. 99, at 3; Sup. Tr., at 13, 14-15, 85, 106.) Officer Jones provided Officer Smith and Sergeant Anders with Potter's driver's license photograph along with his identifiers, including height, weight, and eye color. (R. Doc. 99, at 3.)

Shortly thereafter, Officer Smith witnessed Potter, carrying two bags, exit the back of the motel with a person later identified as Daniel Dryden. (R. Doc. 99, at 3; Sup. Tr., at 109.) Potter placed the bags in the backseat passenger side of the Nissan Maxima, and then went back into the motel. (R. Doc. 99, at 3.) Meanwhile, Dryden drove the Maxima to the front of the motel, then cleaned out some trash from the inside. (R. Doc. 99, at 3.) After a couple minutes, Potter came out of the motel with a bank money bag and sat in the Maxima's front passenger's seat. (R. Doc. 99, at 3.)

The Maxima left the motel parking lot, driving past Officers Jones and Hunter. (R. Doc. 99, at 3-4.) The officers activated their vehicle's lights and sirens and pulled over the Maxima on the side of the road. (R. Doc. 99, at 4.)

They asked Potter and Dryden for their identification.  (R. Doc. 99, at 4.) Potter shuffled through multiple cards before eventually providing his driver's license.  (R. Doc. 99, at 4.)  Officer Jones asked Potter to get out of the Maxima, inquiring if he had any weapons on him.  (R. Doc. 99, at 4.)  Potter did not respond, which was concerning to the officer.  (R. Doc. 99, at 4.) Instead, Potter asked if he could call "his people."  (R. Doc. 99, at 4.)  Officer Jones declined.  (R. Doc. 99, at 4.)  The officer removed Potter's cell phone and wallet from his hands so that the items could not be used against the officers, and also to allow the officer control of Potter's hands for detention. (R. Doc. 99, at 4.)

Officer Hunter brought Potter to the front of the police vehicle, while Officer Jones spoke with Dryden.  (R. Doc. 99, at 5.)  Dryden did not have a valid driver's license.  (R. Doc. 99, at 5.)  As a result, the officers could not allow him to continue driving Potter's Maxima.  (R. Doc. 99, at 5.)  During this time, Officer Jones worked with his dispatcher to confirm that Potter's warrant was still active.  (R. Doc. 99, at 5.)  The dispatcher contacted the warrant's originating agency; if the warrant was still active, the dispatcher would also ask if the agency intended to extradite Potter.  (R. Doc. 99, at 5.)

Officer Hunter patted Potter down for any weapons or contraband. (R. Doc. 99, at 5.)  The officers placed Potter in the back of the police vehicle.

(R. Doc. 99, at 5.) They also confirmed Dryden's driver's license was suspended. (R. Doc. 99, at 5.) Because Dryden could not drive the vehicle, Officer Jones asked Potter if there was anyone available to remove the vehicle from the scene. Potter provided the names of Glen Bernstein and "Erin," the motel night manager.[2] (R. Doc. 99, at 5) He also gave Bernstein's phone number to the officer. (R. Doc. 99, at 6.)

The dispatcher eventually confirmed that Potter's arrest warrant was active and that the originating agency wished to extradite. (R. Doc. 99, at 6.) Officer Jones released Dryden with a warning, and Dryden chose to walk away from the scene. (R. Doc. 99, at 6.) Officer Jones requested that Dryden go back to the motel and get in touch with "Erin," which he agreed to do. (R. Doc. 99, at 6.) Potter, still in the police vehicle, asked if he could speak with Dryden. (R. Doc. 99, at 6.) As they talked, Officer called Bernstein twice, but the attempts went to voicemail. (R. Doc. 99, at 6.)

When Potter and Dryden were finished speaking, Dryden said he would walk back to the motel and ask "Erin" if she would drive Potter's Maxima away. (R. Doc. 99, at 6.) The motel was approximately a five-minute walk from the scene. (R. Doc. 99, at 7.) Dryden asked Officer Jones if he could

---

[2]Potter did not provide Erin's last name. (R. Doc. 99, at 5 & n.14.)

have Potter's keys, but the officer declined because he was unsure if Dryden would actually return with Erin. (R. Doc. 99, at 6-7.)

Next, Officer Jones inventoried Potter's wallet, which contained $3,500 in cash. (R. Doc 99, at 7.) Officers told Potter he was under arrest and read him his *Miranda* rights, which Potter acknowledged. (R. Doc. 99, at 7.) The officers searched Potter incident to arrest; Potter repeatedly hunched over, claiming to have a cyst on his testicles. (R. Doc. 99, at 7.) Potter asked officers to attempt another phone call; Officer Jones showed Potter that he tried to call Bernstein twice. (R. Doc. 99, at 7.) Officer Jones then called Bernstein a third time, but again he did not get an answer. (R. Doc. 99, at 7.)

A separate police vehicle transported Potter from the scene. (R. Doc. 99, at 7.) Officers Jones and Hunter started discussing whether to tow the Maxima given that there was no authorized person to drive it. (R. Doc. 99, at 7.) They contacted their supervisor, who told them to order the tow. (R. Doc. 99, at 7.) Still, instead of immediately requesting a tow, Officer Jones began filling out a portion of the tow sheet in order to provide additional time for "Erin" or Bernstein to arrive. (R. Doc. 99, at 7-8.) Officer Smith and Sergeant Anders were still in the motel parking lot; however, they did not see anyone heading toward the other officers. (R. Doc. 99, at 8.)

The officers' decision to tow the Maxima was made according to the Lee's Summit Police Department's tow policy, specifically Section III(B)(1)(f). (R. Doc. 99, at 8; Sup. Tr., at 56-57.) The policy provides the following, in part:

1.    An officer may tow a vehicle/property within the City Limits of Lee's Summit under the following situations when: (61.4.3b)

. . .

b.    abandoned vehicle/property is left unattended and in such a manner that it obstructs the normal movement of traffic or constitutes a hazard to public safety and there is no reasonable indication that the person in control of the vehicle/property is arranging for its immediate control or removal. (61.4.3a,b)

c.    in the interest of public safety, the vehicle/property removal is necessary. (e.g., fire, flood, snow removal, street work, or other emergency reason)

. . .

f.    the operator of the vehicle/property is taken into custody and at least one of the following conditions exist: (61.4.3b)

- The person is unable to arrange for the vehicle/property's proper and timely removal;

- No passengers are present who can legally remove the vehicle/property with the driver's consent;

- The vehicle/property is illegally parked; or

- The vehicle/property is stopped on private property that does not belong to the operator/owner.

g. an officer has probable cause to believe the vehicle/property is evidence in a crime.

(Gov't Exh. 2, at 3; R. Doc. 99, at 8.)[3] If an officer orders a tow, they must inventory its contents. (Gov't Exh. 2, at 2; R. Doc. 99, at 8.)

The officers subsequently called in the tow and began inventorying the Maxima, starting with the front driver's side door. (R. Doc. 99, at 8.) Approximately eight minutes later, Officer Hunter started searching the rear passenger's side. (R. Doc. 99, at 8.) There, officers found the two bags Potter placed in the back seat. (R. Doc. 99, at 9.) In those bags they discovered several large bags of methamphetamine, small jewelry bags used to package methamphetamine, a small scoop to distribute methamphetamine, digital scales, prescription pills, a cell phone, cash, and marijuana. (R. Doc. 99, at 9.)

Approximately two minutes after searching those bags, the dispatcher informed Officer Jones that methamphetamine was found in Potter's waist at the jail. (R. Doc. 99, at 9.). Based on this, Officer Jones would have still

---

[3] "Gov't Exh." refers to the government's exhibits admitted at the suppression hearing. Government Exhibit 2 is contained in the addendum.

ordered the tow once he learned about those drugs because then the vehicle was potentially evidence of a crime.  (R. Doc. 99, at 9.)

Nearly 25 minutes after the inventory search began, and after the jail found the methamphetamine on Potter, an unidentified man arrived at the scene and asked to take possession of the Maxima.  (R. Doc. 99, at 9.) Officer Hunter, however, had witnessed this person park his motorcycle at a nearby QuikTrip and watch the officers for several minutes.  (R. Doc. 99, at 9.)  The officers declined and the Maxima was towed.  (R. Doc. 99, at 9.)

**B.**     *Procedural History*

The grand jury indicted Potter and Dryden for conspiracy to distribute 500 grams or more of methamphetamine (Count One), and for possessing 500 grams or more of methamphetamine with the intent to distribute it (Count Two).  (R. Doc. 1.)  Potter moved to suppress the evidence recovered from the Maxima, asserting law enforcement violated the Fourth Amendment when they searched his vehicle.  (R. Doc. 74.)  After holding an evidentiary hearing, the district court denied his motion.  (R. Doc. 90, 92, 99, 155.)

Dryden pled guilty, under a written plea agreement, to both counts of the indictment.  (R. Doc. 145, 146.)  In his plea agreement, Dryden acknowledged that he conspired with Potter and others to distribute

methamphetamine, and that he possessed methamphetamine with the intent to distribute it. (R. Doc. 146, at 2, ¶ 3.)

Potter, on the other hand, proceeded to trial. (R. Doc. 212, 215, 218.) Dryden testified against Potter. (R. Doc. 218.) The jury convicted Potter on both counts. (R. Doc. 221.) After the first day of trial, Potter allegedly discussed with another prisoner about "handling" Dryden. (PSR, at 5, ¶ 2.)[4] The U.S. Marshals, hearing about this plan, transported Dryden separately and changed his facility. (PSR, at 5, ¶ 2.)

The PSR calculated Potter's base offense level as 36 under U.S.S.G. § 2D1.1(c)(2), based upon 78,653 kilograms of converted marijuana. (PSR, at 10, 11, ¶¶ 12, 20.) He received a two-level enhancement for maintaining a drug premises. (PSR, at 11, ¶ 21.) Potter also received a two-level enhancement for obstruction of justice, based on his alleged involvement with the attempt to intimidate Dryden. (PSR, at 12, ¶ 24.) With a total offense level of 40, and a criminal history category of VI, Potter's advisory guidelines range was 360 months' to life imprisonment. (PSR, at 11, 19, 25, ¶¶ 28, 53, 92.) He faced a statutory minimum of 10 years' imprisonment. (PSR, at 25, ¶ 91.)

---

[4]"PSR" refers to the presentence investigation report revised on July 7, 2023. Pin cites are to the ECF generated pagination.

At sentencing, after hearing testimony, the district court sustained Potter's objection to the obstruction enhancement but stated that it could still consider the circumstances of Potter's involvement with the situation when analyzing his history and characteristics under the 18 U.S.C. § 3553(a) factors. (Sent. Tr., at 67.)[5] The district court calculated a total offense level of 38, a criminal history category of IV, and an advisory guidelines range of 324 to 405 months' imprisonment. (Sent. Tr., at 83-85.) The court imposed a total within-guidelines sentence of 360 months in prison. (Sent. Tr., at 101;R. Doc. 258.) Potter did not object to the sentence as vindictive. (Sent. Tr., at 102-03.)

Potter timely filed a notice of appeal. (R. Doc. 260.)

---

[5] "Sent. Tr." refers to the transcript of the sentencing held on November 8, 2023. (R. Doc. 283.)

# SUMMARY OF THE ARGUMENTS

First, Potter claims his Fourth Amendment rights were violated when police did not arrest him on a warrant when they first saw him, but instead waited for him to get into his car and leave a motel parking lot. He contends police did this with the intent to conduct a warrantless search of his vehicle. But Potter did not have a constitutional right to be arrested as soon as police had probable cause. Upon his arrest, the police provided Potter an opportunity to have his vehicle retrieved, and even assisted him by making several phone calls, but no one answered. Only when it appeared there was no one who could lawfully retrieve the vehicle did police decide to tow the vehicle and conduct an inventory search. That search was reasonable and there was no evidence it was pretext for an investigatory search. Even if it had been, though, the evidence in the car was still would not have been suppressed given it would have been inevitably discovered.

Second, for the first time on appeal, Potter claims the district court vindictively sentenced him to a within-guidelines sentence because it was much higher than his codefendant, who pled guilty. Potter cannot overcome plain error because vindictive sentencing does not apply to an initial sentence, and he cannot cite any on-point Supreme Court case or binding Eighth Circuit precedent holding a within-guidelines sentence is presumptively vindictive.

# ARGUMENTS

## I.

**The district court did not erroneously interpret the applicable law in denying the motion to suppress, where it concluded that Potter did not have a constitutional right to be arrested prior to leaving the motel parking lot and that the inventory search was reasonable.**

Potter asserts that his Fourth Amendment rights were violated when police conducted a warrantless inventory search of his vehicle. (Potter Brf., at 14.)[6] Specifically, he contends that his "arrest could have taken place at the motel prior to his vehicle leaving the private property or even prior to Potter entering the vehicle the first time and most certainly the second time." (Potter Brf., at 17.) As such, rather than conduct the inventory search, police could have instead obtained a warrant and allowed a judge to consider "that the vehicle was parked on private property." (Potter Brf., at 17.) But the Constitution does not require officers to arrest a defendant immediately upon the formation of probable cause. Moreover, given the totality of the circumstances, the inventory search prior to tow was reasonable.

## A. *Standard of Review*

"In reviewing a denial of a motion to suppress, [this Court] review[s] the district court's findings of fact for clear error, giving due weight to the

_____

[6]Pin cites are to the ECF generated pagination.

inferences police drew from those facts. We review de novo the district court's conclusion that reasonable suspicion or probable cause existed." *United States v. Linnell*, 93 F.4th 1102, 1105 (8th Cir. 2024) (quotation marks omitted). "We will uphold the district court's denial of a motion 'unless it is not supported by substantial evidence, is based on an erroneous interpretation of applicable law, or is clearly mistaken in light of the entire record.'" *Id.*

## B.  *Discussion*

Potter does not dispute the factual findings of the district court. Instead, complains that law enforcement's warrantless inventory search of his vehicle was unjustified because they could have arrested him before he even got into the car and left the motel parking lot. But there is no constitutional right to be arrested as soon as probable cause is established.[7] *See United States v. Johnigan*, 90 F.3d 1332, 1336 (8th Cir. 1996) ("Nor were officers required, upon learning of Johnigan's outstanding arrest warrants, to arrest him immediately while he was still at the hotel, rather than at the airport."); *United States v. Shigemura*, 682 F.2d 699, 706 (8th Cir. 1982) (citing *Hoffa v. United*

_____

[7]Not only did police have no obligation to arrest Potter in the motel parking lot, but it was reasonable for them to wait until he left the area. Testimony at the suppression hearing explained that the reason there were officers in plain clothes in the motel parking lot, while the uniformed officers were down the block, was that having an obvious police vehicle in sight of the motel parking lot would have alerted people to their presence, potentially disrupting the investigation. (Sup. Tr., at 10.)

*States*, 385 U.S. 293, 310 (1966)); *see also Zamarripa v. Busalaki*, 230 F.3d 1365 (8th Cir. 2000) (unpublished table decision) (explaining, in § 1983 case, that plaintiff "had no constitutional right to be arrested at the inception of the criminal investigation").  And there is no doubt, given the facts, that police had reasonable suspicion to stop the Nissan Maxima based on Potter having an outstanding arrest warrant.  *See United States v. Kent*, 531 F.3d 642, 650 (8th Cir. 2008); *United States v. Cardenas-Celestino*, 510 F.3d 830, 833 (8th Cir. 2008) ("When probable cause to arrest exists, police are authorized to stop a vehicle containing the subject.").

The only question remaining, then, is whether the officers could reasonably conduct an inventory search of the Nissan Maxima.  "Police may take protective custody of a vehicle when they have arrested its occupants, . . . even if it is lawfully parked and poses no public safety hazard." *United States v. Martin*, 982 F.2d 1236, 1240 (8th Cir. 1993) (citation omitted).  "The inventory search exception . . . permits law enforcement to inventory the contents of a vehicle that is lawfully taken into custody, even without a warrant or probable cause to search." *United States v. Williams*, 39 F.4th 1034, 1043 (8th Cir. 2022) (quotation marks omitted).  Of course, the inventory search must be reasonable under the totality of the circumstances. *See id.* (citing *United States v. Nevatt*, 960 F.3d 1015, 1020 (8th Cir. 2020)).

Where officers follow standardized police procedures, the inventory search is reasonable because there is no concern about investigatory motive or excessive discretion. *See United States v. Morris*, 995 F.3d 665, 669 (8th Cir. 2021). Still, even failure to follow a standard procedure does not make the inventory search unreasonable, so long as the search is not pretextual or a "ruse for general rummaging in order to discover incriminating evidence." *Id.* (quotation marks omitted).

Although not discussed at the suppression hearing, officers could have arguably towed the vehicle under Section III(B)(1)(b) of the policy, which provides that police may tow an abandoned vehicle that is unattended and constitutes a hazard to public safety and there is no reasonable indication that the person in control of the vehicle is arranging for its immediate control or removal. (Gov't Exh. 2, at 3.) *See United States v. Lowry*, 935 F.3d 638, 642 n.2 (8th Cir. 2019) (explaining appellate court "may affirm on any basis supported by the record"); *see also LeMay v. Mays*, 18 F.4th 283, 287 (8th Cir. 2021) (explaining that under Fourth Amendment "reasonableness" of officer's actions is reviewed objectively and not based on officer's subjective intent). Given the policy's definition of "abandoned property" (Gov't Exh. 2, at 1), a reasonable officer could have concluded that the Maxima was effectively abandoned due to Potter's arrest and, having waited a considerable

time, that there was no indication Dryden was returning with someone to remove the car. Thus, under the policy, the officers still would have been required to conduct an inventory prior to tow.

It is ultimately immaterial, though, whether the officers technically complied with the policy because there was no evidence that the inventory search was pretextual. An inventory search that does not comply with policy is still reasonable unless there is "something else" "suggest[ing] that the police were engaging in their criminal investigatory function, not their caretaking function, in searching the defendant's vehicle." *United States v. Nielsen*, 74 F.4th 572, 577 (8th Cir. 2023) (quotation marks omitted). In other words, there must be "something to suggest that police raised the inventory-search banner in an after-the-fact attempt to justify a simple investigatory search for incriminating evidence." *Morris*, 995 F.3d at 670 (quotation marks omitted).

Here, the officers ordered the tow based on Section III(B)(1)(f) of the Lee's Summit Police Department tow policy. (Gov't Exh. 2; Sup. Tr., at 56-57.) While technically Dryden, not Potter, was the operator of Maxima and he was not taken into custody, the officers reasonably applied the intent of the policy—that the police have to consider, in their caretaking function, what to do with a vehicle that, as a result of an arrest, cannot otherwise be removed

from public property.  *See Heien v. North Carolina*, 574 U.S. 54, 66 (2014) (holding that Fourth Amendment tolerates officers objectively reasonable mistakes).  This indicates that the officers were attempting to effectuate an inventory search, not conduct an investigatory search.

Additional evidence supports this conclusion.  Before the officers conducted the inventory, they allowed Potter ample opportunity to arrange for someone else—who could legally drive—to retrieve the car.  Although not required to by policy, the officers made multiple phone calls to Bernstein on Potter's behalf.  When Dryden decided to leave the scene, officers requested that he contact "Erin," the alleged motel night manager.[8]  They then waited for Dryden to return, even delaying calling in the actual tow, to give Dryden more time.  It was only after it was clear that Dryden was not coming back did the officers finally decide to call for the tow truck.  And even then, when officers began the inventory search, the did not go straight to the bags Potter left in the back seat.  Instead, they started with the front driver's side door, only getting to the bags eight minutes later.  And at the time, there was no

---

[8]Potter makes much of the officer's refusal to give the car key to Dryden.  But, as noted above, once Potter was in custody, police had protective custody of the Maxima.  It was reasonable for them to decline providing the vehicle key to a person without a valid driver's license.  It was further reasonable for them to assume Dryden might not be able to provide the key to Erin, a concern borne out when neither Dryden nor Erin returned for the car.

reason for the police to believe Potter was involved in other criminal activity. Simply put, there is no evidence the officers raised the inventory search in an after-the-fact attempt to justify an investigatory search.

Lastly, other than his claim that his Constitutional rights were violated when police did not arrest him before he entered his vehicle, Potter does not challenge the district court's decision to deny his motion to suppress based on the inevitable discovery doctrine. (R. Doc. 99, at 16-18.) Therefore, he has abandoned on appeal any argument against inevitable discovery. *See United States v. Chaplain*, 864 F.3d 853, 858-59 (8th Cir. 2017); *United States v. Flores*, 362 F.3d 1030, 1039 n.3 (8th Cir. 2004).

Inevitable discovery is an exception to the exclusionary rule. *See United States v. Smith*, 21 F.4th 510, 517 (8th Cir. 2021). "Under that doctrine, 'the government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternatively line of investigation at the time of the constitutional violation.'" *Id.*

In this case, Potter had an active "no bond" arrest warrant, which meant police were going to arrest him. Once the jail found the methamphetamine on Potter, combined with his attempt to avoid the initial pat down, officers

would have had probable cause under the automobile exception to search the vehicle. *See United States v. Keck*, 2 F.4th 1085, 1089 (8th Cir. 2021) (describing automobile exception). Alternatively, the tow policy also allowed the officers to tow and inventory the vehicle if they had probable cause to believe the vehicle was evidence in a crime. (Gov't Exh. 2, at 3.) Officer Jones explained that, once the jail told him about the methamphetamine found on Potter during booking, he would have ordered the Maxima towed under that authority. This demonstrates inevitable discovery by a preponderance.

## II.

**The district court did not plainly err by vindictively sentencing Potter when it imposed a within-guidelines sentence.**

Next, Potter claims, without any evidence, that the district court vindictively sentenced him when it imposed a within-guidelines sentence. Of course, Potter did not object on this basis before the district court, and he has not overcome plain error on appeal.

### A.    *Standard of Review*

Where a defendant does not object before the district court that its sentence was vindictive, this Court reviews for plain error. *See United States v. Williams*, 976 F.3d 781, 784 (8th Cir. 2020), *vacated on other grounds*, *Williams v. United States*, 142 S. Ct. 1439 (2022). To meet this standard, a defendant "must show (1) an error, (2) that was plain, and (3) that it affected a substantial right." *United States v. Simmons*, 70 F.4th 1086, 1091 (8th Cir. 2023). "An error affects a substantial right if there is 'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *Id.* (quoting *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016)). "If those three requirements are met, an appellate court may grant relief if it concludes that the error had a serious effect on 'the fairness,

integrity or public reputation of judicial proceedings.'" *Greer v. United States*, 593 U.S. 503, 508 (2021).

## B. *Discussion*

Potter contends that the district court vindictively sentenced him to 360 months' imprisonment for simply exercising his right to trial. He also asserts that he should receive a presumption of vindictiveness. But Potter has not shown that the district court had a personal stake in the sentencing. *See Williams*, 976 F.3d at 785 (citing *Texas v. McCullough*, 475 U.S. 134, 139 (1986)). Most importantly, vindictive sentencing does not apply to an initial sentence. *See Williams*, 976 F.3d at 786 (citing *Waring v. Delo*, 7 F.3d 753, 758 (8th Cir 1993)). Potter cannot cite any on-point decision by the Supreme Court or binding Eighth Circuit precedent holding that the district court's actions in this case amounted to vindictive sentencing. *See United States v. Lachowski*, 405 F.3d 696, 698 (8th Cir. 2005).

Anyway, Potter cannot establish that his substantial rights were affected. He challenges neither the procedural nor substantive reasonableness of his sentence. The district court calculated the advisory guidelines and analyzed the 18 U.S.C. § 3553(a) factors. (Sent. Tr., at 38, 101-02.) Its sentence was within the advisory guidelines range (uncontested on appeal), which means it is presumptively reasonable. *See United States v. Goodhouse*,

81 F.4th 786, 793 (8th Cir. 2023). To the extent Potter believes that vindictiveness can be presumed based on disparate sentences between codefendants, "[t]he statutory direction to avoid unwarranted disparities among defendants . . . refers to national disparities, not differences among co-conspirators . . . ."[9] *United States v. Pierre*, 870 F.3d 845, 850 (8th Cir. 2017); *see also United States v. Fry*, 792 F.3d 884, 890 (8th Cir. 2015) (explaining there is no presumption of vindictiveness where defendant complained about "a disparity of sentences imposed on two different people").

---

[9]In his brief, Potter states that "[a]t sentencing the trial court indicated the Defendant was a difficult client and filed documents harsh to the government and the system." (Potter Brf., at 23.) He argues that these statements, combined with the court imposing a lower sentence for his codefendant, "clearly reflect[s] punishment for Defendant's tactics of requesting a trial and filing a tremendous amount of pro se motions/demands." (Potter Brf., at 23.) Potter mischaracterizes the district court's statements. Contrary to Potter's allegations, the district court made these statements in explaining the excellent performance of his attorney. (Sent. Tr., at 99-100.) The court stated that Potter received "plenty of due process, and that's the way the system should work." (Sent. Tr., at 100.) The district court said, "I'm proud to be a part of that system" that provided Potter with due process, and that he was "given so many opportunities and so much support from the system." (Sent. Tr., at 100.) Lastly, the court explained that Potter was "being sentenced for your criminal conduct, and your criminal conduct, the drug weight, puts you at 324 months to 405 months." (Sent. Tr., at 100.) At no point did the district court suggest it was punishing Potter more severely for electing to go to trial.

## CONCLUSION

For the above reasons, this Court should affirm Potter's convictions and sentence.

Respectfully submitted,

TERESA A. MOORE
  United States Attorney

By      /s/ *Justin G. Davids*

JUSTIN G. DAVIDS
  Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Room 5510
Kansas City, Missouri  64106
Telephone:  (816) 426-3122

*Attorneys for Appellee*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,093 words. This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 software in 14-point, Times New Roman font. Furthermore, the document has been determined to be virus-free in compliance with Eighth Circuit Rule 28A(h).

 /s/ *Justin G. Davids*
Justin G. Davids
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system.  A paper copy will be served on participants in the case by U.S. Mail, postage prepaid, within five days of the Court's notice that the brief and addendum have been reviewed and filed.

I hereby certify that a copy of the Government's brief was mailed on April ___, 2024, to:

> Christopher S. Swiecicki
> Swiecicki & Muskett, LLC
> 16100 Chesterfield Parkway W
> Suite 368
> Chesterfield, Missouri  63017

> _/s/ Justin G. Davids_____
> Justin G. Davids
> Assistant United States Attorney